**CITY OF ROCHESTER, Appellant,**

v.

**PEOPLE'S COOPERATIVE POWER ASSOCIATION, INC., etc., et al., Respondents,**

**Minnesota Public Utilities Commission, and Minnesota Department of Public Service, Intervenors, Respondents.**

**Nos. C2–90–2141, C5–90–2148 and C5–90–2151.**

Supreme Court of Minnesota.

April 24, 1992.

Richard V. Ehrick, Joseph F. Chase, O'Brien, Ehrick, Wolf, Deaner & Maus, Rochester, for appellant.

Kenneth R. Moen, Dunlap, Finseth, Berndt & Sandberg, Rochester, for People's Co-op. Power Ass'n.

Margaret Hendrickson, St. Paul, for MN Public Utilities Comn.

COYNE, Justice.

At issue are the alternative procedures afforded by operation of either Minn.Stat. § 216B.44 or Minn.Stat. § 216B.47 to the City of Rochester in its efforts to acquire the facilities and service area rights of People's Cooperative Power Association, Inc. in territory newly annexed by the City. The City has sought review of a decision of the court of appeals affirming the district court's reliance upon the doctrine of pri-

mary jurisdiction to compel the City to proceed within the framework of section 216B.44. 466 N.W.2d 753. We reverse and remand.

On December 18, 1989 the City of Rochester adopted an ordinance annexing certain areas, most of which were uninhabited at the time of annexation. Several weeks later, the city council adopted the first of four condemnation resolutions affecting the annexed territory and, in accordance therewith, the City filed, on January 31, 1990, the first of three petitions for condemnation and notices of intent to take possession pursuant to the "quick take" condemnation proceeding authorized by Minn.Stat. § 117.042.

The annexed territory was part of the exclusive service area that had been assigned by the Minnesota Public Utilities Commission to the Cooperative. The condemnation proceedings were not directed to the acquisition of the annexed land—those areas newly located within the City's corporate limits—but rather to the acquisition of the Cooperative's facilities and the service area rights [1] located within the newly annexed territory. Asserting that the City was required to proceed in compliance with Minn.Stat. §§ 216B.41 and 216B.44, the Cooperative and the MPUC together secured a temporary restraining order preventing the City from extending its electric service into the Cooperative's assigned service area. The district court held that while the court had jurisdiction over the proceedings in eminent domain authorized by section 216B.47, the MPUC had concurrent jurisdiction pursuant to section 216B.44. However, concluding that the "subject matter involved is not within the traditional knowledge of Court-appointed commissioners whose primary experience is in real estate valuation," the district court invoked the doctrine of primary jurisdiction to decline jurisdiction. By virtue of that determination, the City was directed to proceed in

---

1. We have addressed the question of whether a city can acquire a property already held for public use, holding that "a city possessing a general power to condemn may acquire the property and *service area* of an electric coopera-

tive association if a consistent use of the property is intended." *City of Shakopee v. Minnesota Valley Electric Coop.,* 303 N.W.2d 58, 60 (Minn. 1981) (emphasis added).

accordance with the agency procedures outlined in Minn.Stat. § 216B.44.

The court of appeals affirmed, acknowledging the district court's jurisdiction over the eminent domain proceedings, but deferring to the exercise of its discretion in invoking the doctrine of primary jurisdiction to dismiss the petitions and thereby compel the municipality to initiate proceedings before the MPUC pursuant to Minn. Stat. § 216B.44 to extend its service territory.

Our inquiry is therefore narrowly defined—whether the statutory procedural options available to the municipality may be judicially limited by application of the doctrine of primary jurisdiction.

A specific examination of the regulatory framework created by the legislature is necessary to an understanding of the present controversy. In 1974 the legislature enacted what is now chapter 216B, entitled "Public Utilities," prefacing the chapter with a "legislative finding," announcing its statement of purpose—

> to provide the retail consumers of natural gas and electric service in this state with adequate and reliable services at reasonable rates, consistent with the financial and economic requirements of public utilities and their need to construct facilities to provide such services or to otherwise obtain energy supplies, to avoid unnecessary duplication of facilities which increase the cost of service to the consumer and to minimize disputes between public utilities which may result in inconvenience or diminish efficiency in service to the consumers.

Minn.Stat. § 216B.01 (1990). In recognition of the effectiveness of municipal and cooperative utilities' self-regulation, the legislature excepted them from general regulation; it reserved regulatory authority to the MPUC, however, in certain specific instances including the assignment of service areas. Minn.Stat. § 216B.39.

■ By operation of this comprehensive service area assignment plan, a utility is afforded an exclusive right to provide service at retail "to each and every present and future customer in its assigned service area." Minn.Stat. § 216B.40. However, the right is not without limitation, for the legislature anticipated the possibility that municipalities experiencing a population growth might expand their geographical boundaries. Section 216B.41. For that apparent reason, there exist two alternative statutory procedures by which an expanding municipality which owns and operates a utility may similarly expand or extend its provision of utility services to annexed territory. Sections 216B.41 and 216B.47. First, the legislature has authorized the purchase by the expanding municipality of the facilities of the assigned service utility by the payment of the appropriate value, a value to be among the terms of the sale or exchange to be determined by the MPUC in the event of a dispute. Section 216B.44. A notable feature of this acquisition process is that the existing assigned service utility is authorized to continue providing service to the area until the value is determined. *Id.* In practical effect, then, by operation of statute, the Cooperative retains the interim authority to design and construct facilities, unless, after notice and hearing, the MPUC determines that an interim extension of services "is not in the public interest." *Id.*

Parallel to this regulatory scheme under the auspices of the MPUC is the continuing authority of a municipality to acquire the property of a public utility by eminent domain proceedings, under the jurisdiction of the courts. Section 216B.47. There, the damages to be paid the displaced utility are determined by court-appointed commissioners and are to reflect the same factors which the MPUC would have considered had the acquisition occurred by operation of sections 216B.41 and 216B.44. However, the distinction in the invocation of "quick take" eminent domain procedures is that the municipality thereby acquires the immediate right to service the newly annexed areas before the final compensation is determined or awarded.

■ Therefore, although sections 216B.41 and 216B.44 authorize a municipality which operates its own electrical utility and decides to provide service to annexed

territory to proceed under section 216B.44, the legislature has by its enactment of section 216B.47 provided such municipalities with the option to proceed instead by eminent domain. The election is, therefore, the product of the legislative alternatives and is, accordingly, secured to the municipality. What then remains for our consideration is whether, by operation of the doctrine of primary jurisdiction, that right of election may be judicially limited.

 The doctrine of primary jurisdiction is a "judicially created doctrine * * * concerned with the orderly and sensible coordination of the work of agencies and courts." *State, by Pollution Control Agency v. United States Steel Corp.*, 307 Minn. 374, 380, 240 N.W.2d 316, 319 (Minn. 1976). Its application promotes "proper relationships between the courts and administrative agencies charged with particular regulatory duties," and is used "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956). Use of the doctrine ensures, first, that agencies are not passed over " 'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion,' " and then, that " 'uniformity and consistency' " result. *United States Steel Corp.*, 240 N.W.2d at 319–20 (quoting *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952)). The doctrine is inapplicable if the issues raised are " 'inherently judicial,' unless the legislature has explicitly granted exclusive jurisdiction to the administrative body." *Manchester Terminal Corp. v. Texas TX TX Marine Transportation, Inc.*, 781 S.W.2d 646, 649 (Tex.Ct.App.1989).

Here, there can be no doubt that the City will eventually obtain permanent service area rights whether it proceeds before the MPUC or before the judicial branch by eminent domain. As a result, there is no issue as to the propriety of the expansion or concerning the municipality's right to acquire the facilities of the electric utility serving the area, nor is there an implication of those matters to which the MPUC's expertise and supervisory powers are directed in its broad legislative charge. Instead, the question is simply whether the matter of compensation and its method of determination is one uniquely suited to agency disposition.

In that regard, the respondents first argue that the statewide system of regulation would be severely jeopardized by judicial determination of the compensation award and that uniformity in award is impossible without resort to the one regulatory body charged therewith. *See, e.g., United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 65, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). However, that argument is not sustained by the obvious fact that valuations, with their many variables, are necessarily considered on a case-by-case basis and local variation undoubtedly occurs. Moreover, the eminent domain statute, Minn.Stat. § 216B.47, requires consideration of the same specifically enumerated factors in determining the compensation award as those utilized in proceedings before the MPUC pursuant to Minn.Stat. § 216B.44.

The respondents then assert that the use of eminent domain in this instance is destructive of the regulatory goals and that use of "quick take" by the City without an interim service determination before the MPUC allows the municipality to circumvent legislative intent and bypass the public interest test and nonduplication of facilities standards contained in Minn.Stat. § 216B.44. Moreover, they express concern that the City could abandon the condemnation proceedings after taking possession of the condemnee's property and installing an electrical system. The public interest test, however, is designed to restrict extension of the system by the displaced utility, not the acquiring municipality, and utilization of the "quick take" procedure requires a showing by the condemnor of necessity for acquiring title and possession prior to the filing of the commissioners' award and payment or deposit with the court of its approved appraisal value. Minn.Stat. § 117.042.

While some courts have employed a balancing test to determine the appropriateness of the application of the doctrine of primary jurisdiction, *Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1473 (5th Cir.1987), it is our view that this question of the method of determining compensation is not of a nature which invokes the doctrine. We have long acknowledged the competence of court-appointed commissioners to determine "just compensation," and, in view of that circumstance, we perceive no reason to interfere with the legislatively approved alternatives available to the municipality. *See Brevik v. Kite Painting, Inc.*, 416 N.W.2d 714 (Minn. 1987); *see also Iowa Electric Light & Power Co. v. City of Fairmont*, 243 Minn. 176, 67 N.W.2d 41 (1954).

In conclusion, it is our view that while the trial court and court of appeals correctly acknowledged the existence of legislatively defined parallel, yet alternative, procedures by which an expanding municipality is able to acquire facilities and service area rights of another utility, the doctrine of primary jurisdiction is inapplicable to deprive the municipality of that right of election by requiring it to adopt one procedure rather than the other. That conclusion is mandated where the sole issue presented is one of "just compensation"— an issue guided in either forum by identical considerations and not implicating the unique administrative experience of the agency. We therefore defer to the exercise of the municipality's discretion and judgment in electing to proceed by eminent domain in accordance with Minn.Stat. § 216B.47. *See Miller v. Foley*, 317 N.W.2d 710 (Minn.1982); *Housing & Redevelopment Authority v. Minneapolis Metropolitan Co.*, 259 Minn. 1, 104 N.W.2d 864 (1960).

Reversed and remanded.

KEITH, C.J., took no part in the consideration or decision of this case.