**CITY OF MOORHEAD, Appellant,**

v.

**RED RIVER VALLEY COOPERATIVE POWER ASSOCIATION, Respondent.**

No. A11–705.

Court of Appeals of Minnesota.

Jan. 30, 2012.

Kathleen M. Brennan, Corey J. Ayling, McGrann Shea Carnival Straughn & Lamb, Chtd., Minneapolis, MN; and Benjamin E. Thomas, Wold Johnson, P.C., Fargo, ND, for appellant.

Harold LeVander, Jr., Felhaber, Larson, Fenlon & Vogt, P.A., St. Paul, MN; and Sara Gullickson McGrane, Jessica M. Marsh, Minneapolis, MN, for respondent.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae League of Minnesota Cities.

Elizabeth A. Wefel, Flaherty & Hood, P.A., St. Paul, MN, for amici curiae Minnesota Municipal Utilities Association, Missouri River Energy Services, Western Minnesota Municipal Power Agency, Coalition of Greater Minnesota Cities.

Considered and decided by HUDSON, Presiding Judge; PETERSON, Judge; and STONEBURNER, Judge.

## OPINION

HUDSON, Judge.

Appellant-condemnor City of Moorhead (city) acquired the right to provide utility service to an area within the service territory of respondent Red River Valley Cooperative Power Association (Red River). On appeal from the award of damages to Red River, the city argues that (1) the district court misapplied Minn.Stat. § 216B.47 when it determined that the statute's reference to four non-fair-market-value factors for calculating damages precludes consideration of fair market value and, as a result, the jury instructions regarding damages erroneously excluded consideration of fair market value; (2) the district court abused its discretion by granting a motion in limine to preclude admission of certain evidence; and (3) the jury's damage award is inconsistent with the relevant law and unsupported by the record.

Because (1) fair market value is not the proper measure of damages under Minn. Stat. § 216B.47, and thus fair-market-value evidence was properly excluded from the trial and the jury instructions; (2) the expert's report was properly excluded; and (3) the jury's special verdict is supported by the evidence, we affirm.

## FACTS

In November 2006, the city filed a petition for condemnation in Clay County District Court to acquire part of the electric service area of Red River. Red River is a rural electric cooperative, headquartered in Halstad, which serves about 4,700 customers. Under Minnesota law, electric utilities are assigned a specific service area and have the exclusive right to provide electric service within that service area. Minn.Stat. § 216B.40 (2010). The electric service area at issue is a residential subdivision called Americana Estates that provided service to 63 customers. Americana Estates was annexed into the city in 2006. Pursuant to Minn.Stat. § 216B.47, a municipality may, by eminent domain, acquire the right to provide utility service in an area where a public utility supplies services, "provided that damages to be paid in [the] eminent domain proceedings must include the original cost of the property less depreciation, loss of revenue to the utility, expenses resulting from integration of facilities, and other appropriate factors." The proper interpretation of this statute

and specifically the second factor—loss of revenue to the utility—is the crux of this appeal.

In May 2007, the district court granted the city's petition and appointed commissioners to determine the amount of damages suffered by Red River. In February 2009, the commissioners awarded $19,867 for "[o]riginal cost of facilities less depreciation," $261,891 for "[l]oss of revenue to the Cooperative," $25,456 for "[e]xpenses resulting from integration of facilities," and $0 for "[o]ther appropriate factors." Both the city and Red River appealed the commissioners' award, and the matter proceeded to the district court for de novo review. See Minn.Stat. § 117.145 (2010) (stating that any party may appeal an award of damages to the district court).

The city and Red River filed cross-motions for summary judgment or, in the alternative, motions in limine. Red River requested partial summary judgment, alleging that the four factors enumerated in Minn.Stat. § 216B.47 do not include the fair market value of the utility business before and after the acquisition. In the alternative, Red River moved for an order excluding the portions of a report by the city's expert witness, Robert Strachota, that discussed fair market value. Conversely, the city argued that fair market value is the appropriate damages standard in eminent-domain proceedings, that testimony based on that standard should not be excluded, and that Red River failed to meet its burden of proof because it did not provide fair-market-value information. In March 2010, the district court granted Red River's motion for partial summary judgment, concluding that "the appropriate legal damages standard in this eminent domain proceeding is that of Minnesota Statute[s] [section] 216B.47," and that the jury would be instructed that damages should include the four factors set forth in Minn.Stat. § 216B.47. The district court excluded all evidence regarding fair market value, including the sections of Strachota's report that discussed fair market value.

On September 8, 2010, the city provided Red River with a revised expert report prepared by Strachota. In response, Red River again filed a motion in limine to exclude portions of the report. Red River argued that Strachota's revised report contained numerous changes, including a claimed credit of $78,957 for the net loss of revenue for deferred capital investment. Red River argued that this new claim would require additional discovery and that the deadline for both disclosure of expert reports and discovery had already expired. The district court granted Red River's motion in limine to exclude the section of Strachota's report that discussed the claimed deduction for deferred capital investment, as well as any testimony or evidence related to the new deduction of $78,957.

Following two postponements and multiple scheduling orders, a jury trial was held. The parties stipulated to the amount of damages for three of the four factors under Minn.Stat. § 216B.47: (1) $19,867 for "the original cost of the property less depreciation"; (2) $25,579 for "expenses resulting from integration of facilities"; and (3) $0 for "other appropriate factors." Only the second factor, "loss of revenue to the utility," was in dispute at trial. The city and Red River presented different positions regarding loss of revenue, based on the opinions of each party's expert.

Dennis Eicher, Red River's expert, testified that he calculated $339,865 in damages. Eicher testified that he is a consulting engineer with over 40 years of experience with electric utilities, but that he is not an appraiser. Eicher used a "net loss of revenue" analysis, which he

described as "the gross revenue that [Red River] lose[s], minus the avoided costs that [Red River] [is] able to avoid by not serving the area," to calculate the amount of damages under the "loss of revenue" factor. Applying the "net loss of revenue" analysis, Eicher followed a four-step process. First, he estimated that the revenue Red River would have received if it continued to serve the area would have been $101,200. Second, he calculated the amount of expenses that Red River would avoid by not serving the area. He calculated the avoided expenses for the first year as follows: $53,473 in purchased power expenses, $3,465 in operation and maintenance expenses, $1,663 in depreciation expenses, $756 in customer-related expenses, $756 in administrative and general expenses, and $993 in interest expenses. Third, he netted out the two quantities, for a net loss of revenue of $40,095 in the first year. Finally, he projected the loss of revenue over a ten-year period and discounted it to present value, for a total of $339,865.

The city's expert, Strachota, opined that damages were $125,000. He testified that he has been an appraiser for over 35 years, has appraised various types of utilities, and has several designations from the appraisal industry. Strachota testified that he calculated net revenues for a ten-year period beginning on February 19, 2009, using Red River's actual expenses in 2009. He calculated the average life of Red River's equipment to be 16.31 years and found that the avoided capital costs were $3,563. Strachota estimated that approximately 65 percent of the infrastructure in Americana Estates was 33 years old or older. He further testified that the cost of purchased power in 2009 was 64.2 percent of revenues and forecast the cost of purchased power to be 63 percent of revenues for the rest of the period. Strachota disagreed

with Eicher's calculations for purchased power. He testified that Eicher calculated purchased power per customer to be $822 and 52 percent of revenue, when it was actually $1,060 per customer and 63 percent of revenue. Strachota testified that he considered the customers in Americana Estates to be similar to typical customers in Red River's service area. He calculated $17,653 for avoided operation and management expenses by dividing total costs by the number of customers in Red River's service area, and then multiplying the average cost by the number of customers in Americana Estates.

Significantly, Strachota was not permitted to testify about the damages using a fair-market-value method at trial. On the third day of trial, the city made an offer of proof, out of the presence of the jury, that Strachota would testify as to his opinion regarding damages using the fair-market-value method and about Red River's avoided deferred-capital investment. The city stated that Strachota would testify to a significantly lower amount for the loss-of-revenue factor using a fair-market-value analysis. The district court noted the offer of proof but did not allow the testimony. The city also submitted proposed jury instructions to the district court that included fair market value; the district court rejected them.

The jury returned its verdict and awarded $339,865 to Red River for "loss of revenue." The total verdict, including the stipulated damages, was $385,311, and the district court entered judgment against the city accordingly.

The city moved for judgment as a matter of law or, in the alternative, a new trial, arguing that it was prejudiced by the district court's ruling that the proper standard for damages does not include fair market value and the district court's exclu-

sion of all fair-market-value evidence. The district court denied the city's motion. This appeal follows.

## ISSUES

I. Did the district court err when it determined that fair market value is not the proper measure of damages under Minn.Stat. § 216B.47 and excluded fair-market-value evidence from the trial and the jury instructions?

II. Did the district court abuse its discretion when it granted a motion in limine to exclude an expert's report?

III. Was the jury's special verdict supported by the evidence?

## ANALYSIS

### I

The city argues that the district court erred as a matter of law when it prohibited reference to fair market value to determine loss-of-revenue damages under Minn.Stat. § 216B.47. This court reviews questions of law de novo. *Lee v. Fresenius Med. Care, Inc.,* 741 N.W.2d 117, 122 (Minn.2007). The district court's denial of a motion for judgment as a matter of law is also reviewed de novo, and the evidence is viewed "in the light most favorable to the prevailing party." *Bahr v. Boise Cascade Corp.,* 766 N.W.2d 910, 919 (Minn.2009). We also review the district court's decision not to grant a new trial under an abuse-of-discretion standard. *Moorhead Econ. Dev. Auth. v. Anda,* 789 N.W.2d 860, 892 (Minn.2010).

The city also argues that the district court abused its discretion when it excluded evidence regarding fair market value. This court will not disturb a district court's evidentiary ruling "unless it is based on an erroneous view of the law or

constitutes an abuse of discretion." *Kroning v. State Farm Auto. Ins. Co.,* 567 N.W.2d 42, 45–46 (Minn.1997) (quotation omitted). The city further argues that the district court abused its discretion when it excluded fair market value from the jury instructions. A district court's decision regarding jury instructions is also given broad discretion and will not be reversed unless the district court abused its discretion. *Hilligoss v. Cargill, Inc.,* 649 N.W.2d 142, 147 (Minn.2002). The district court's decision will be upheld as long as the jury instructions "overall fairly and correctly state the applicable law." *Id.*

### *Eminent domain*

Both the United States and Minnesota Constitutions require that just compensation be paid when private property is taken for public use. U.S. Const. amend. V; Minn. Const. art. 1, § 13. To determine the appropriate amount of "just compensation" for a partial taking, the Minnesota Supreme Court has applied the following standard: "[T]he measure of damages is the difference between fair market value of the entire piece of property immediately before the taking and the fair market value of the remainder of the property after the taking." *State by Humphrey v. Strom,* 493 N.W.2d 554, 558 (Minn.1992); *City of St. Paul v. Rein Recreation, Inc.,* 298 N.W.2d 46, 49 (Minn. 1980). To determine fair market value, "any competent evidence may be considered if it legitimately bears upon the market value." *Strom,* 493 N.W.2d at 559 (quotation omitted); *Ramsey Cnty. v. Miller,* 316 N.W.2d 917, 919 (Minn.1982).

In Minnesota, eminent-domain procedure is governed by Minn.Stat. §§ 117.012–.57 (2010). The relevant statute provides that:

Notwithstanding any other provision of law, including any charter provision, ordinance, statute, or special law, all condemning authorities, including home rule charter cities and all other political subdivisions of the state, must exercise the power of eminent domain in accordance with the provisions of this chapter, including all procedures, definitions, remedies, and limitations.

Minn.Stat. § 117.012, subd. 1. The Minnesota Supreme Court has held that chapter 117 is not limited to condemnation of real estate but also applies to utilities. *Iowa Elec. Light & Power Co. v. City of Fairmont*, 243 Minn. 176, 182, 67 N.W.2d 41, 44 (1954). Cities have broad power to acquire electric utilities by eminent domain "if a consistent use of the property is intended." *City of Shakopee v. Minn. Valley Elec. Coop.*, 303 N.W.2d 58, 60 (Minn. 1981).

### Chapter 216B

The Minnesota Public Utilities Act, Minn.Stat. §§ 216B.02–.82 (2010), regulates electric utilities in Minnesota. Minn. Stat. § 216B.01 (2010). That act provides "two alternative statutory procedures by which an expanding municipality which owns and operates a utility may similarly expand or extend its provision of utility services to annexed territory." *City of Rochester v. People's Coop. Power Ass'n*, 483 N.W.2d 477, 479 (Minn.1992). The first option is to proceed under Minn.Stat. § 216B.44 to purchase electric-utility services, with the Minnesota Public Utilities Commission (MPUC) determining "the appropriate value of the property within the annexed area." Minn.Stat. § 216B.44(b). To make that determination, the MPUC "shall consider the original cost of the property, less depreciation, loss of revenue to the utility formerly serving the area, expenses resulting from integration of fa-

cilities, and other appropriate factors." *Id.*

The second option is to proceed using eminent-domain proceedings pursuant to Minn.Stat. § 216B.47. That statute provides, in relevant part:

Nothing in this chapter may be construed to preclude a municipality from acquiring the property of a public utility by eminent domain proceedings; provided that damages to be paid in eminent domain proceedings must include the original cost of the property less depreciation, loss of revenue to the utility, expenses resulting from integration of facilities, and other appropriate factors.

*Id.* Under this option, the same factors are considered by court-appointed commissioners, instead of the MPUC. Minn.Stat. § 216B.47; *City of Rochester*, 483 N.W.2d at 479. The Minnesota Supreme Court has recognized that Minn.Stat. § 216B.44 and Minn.Stat. § 216B.47 set forth two separate procedures, and a municipality can choose which one to follow. *City of Rochester*, 483 N.W.2d at 479–81 (concluding that the doctrine of primary jurisdiction could not limit the municipality's right to choose between the two procedures).

The issue of whether fair market value can be considered to determine just compensation in eminent-domain proceedings conducted pursuant to Minn.Stat. § 216B.47 has not been decided. However, this court has previously reviewed the MPUC's application of the four factors enumerated in Minn.Stat. § 216B.44. *See, e.g., In re City of Redwood Falls*, 756 N.W.2d 133 (Minn.App.2008); *In re Grand Rapids Pub. Utils. Comm'n*, 731 N.W.2d 866 (Minn.App.2007); *In re Application by Rochester for Adjustment of Serv. Area Boundaries*, 556 N.W.2d 611 (Minn.App. 1996), *review denied* (Minn. Feb. 26, 1997); *In re Annexation of Portion of Serv. Territory of People's Coop. Power Ass'n*, 470

N.W.2d 525 (Minn.App.1991), *review denied* (Minn. July 24, 1991). Notably, the MPUC did not apply a fair-market-value standard in the cases that proceeded under Minn.Stat. § 216B.44. Instead, the MPUC applied a "net-loss-revenue" formula to calculate lost revenue under Minn. Stat. § 216B.44. *In re Grand Rapids*, 731 N.W.2d at 872; *In re City of Redwood Falls*, 756 N.W.2d at 139. In *In re Grand Rapids*, this court concluded that the "net-loss-revenue" formula is "an appropriate method" to calculate damages. 731 N.W.2d at 872. This formula, which was developed by the MPUC in 1990, does the following:

> (1) [D]etermines gross revenues for each year of the compensation period, which the [c]ommission has set at ten years, to reflect the intermediate planning period of most utilities; (2) determines avoided costs that the utility would no longer be required to incur because it is no longer serving the area (such costs would include the purchase of power to be sold within the area); (3) subtracts the avoided cost from the gross revenues, which results in yearly net-revenue loss for each year in the ten-year compensation period; and (4) reduces net revenue losses to present value.

*Id.* at 869.

### Plain language of Minn.Stat. § 216B.47

Notwithstanding the MPUC's use of "net-loss-revenue" in section 216B.44 proceedings, the city argues that the plain language of section 216B.47 does not preclude consideration of fair market value or exempt electric-service territories from the damages analysis that applies in the typical eminent-domain proceeding. Thus, the city contends that the traditional measure of eminent-domain damages—fair market value—should apply. In its order denying

judgment as a matter of law or, in the alternative, a new trial, the district court examined the plain language of Minn.Stat. § 216B.47 and found that "the Legislature specifically included the four factors in section 216B.47 with no reference to fair market value analysis; instead that section specifically says that *the damages must* include the factors, not that an analysis of fair market value damages should take the factors into consideration."

■ When interpreting a statute, this court must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2010). Further, this court must "construe statutes to effect their essential purpose" but must not "disregard a statute's clear language to pursue the spirit of the law." *Lee*, 741 N.W.2d at 123. A statute that is unambiguous is interpreted by the plain language of its text, while an ambiguous statute requires further analysis in order to determine the legislature's intent. *Brua v. Minn. Joint Underwriting Ass'n*, 778 N.W.2d 294, 300 (Minn. 2010); Minn.Stat. § 645.16. When considering the legislature's intent, this court must presume that "the legislature does not intend a result that is absurd, impossible of execution, or unreasonable," and that "the legislature intends the entire statute to be effective and certain." Minn. Stat. § 645.17(1), (2) (2010).

■ Here, the plain language of Minn.Stat. § 216B.47 states that "damages to be paid in eminent domain proceedings must include the original cost of the property less depreciation, loss of revenue to the utility, expenses resulting from integration of facilities, and other appropriate factors." The statute does not specifically state whether fair market value may or may not be considered along with the specified four factors; indeed, neither the statute nor any other provision of chapter

216B contains the phrase "fair market value." The city seizes on that omission and argues that Minn.Stat. § 216B.47 does not preclude consideration of fair market value because fair market value is not specifically addressed or excluded in the statutory language, and the four factors are not inconsistent with the principles of just compensation or fair market value. But the Minnesota Supreme Court has held that "[t]he doctrine of *expressio unius est exclusio alterius* means that the expression of one thing is the exclusion of another. *Expressio unius* generally reflects an inference that any omissions in a statute are intentional." *State v. Caldwell*, 803 N.W.2d 373, 383 (Minn.2011) (citations omitted); *see* Minn.Stat. § 645.19 (2010) (codifying the doctrine of *expressio unius*). Thus, we conclude that the words "must include" limit the fact-finder to consideration of only the four specifically enumerated factors.

The city also argues that fair market value need not be characterized as an additional factor under Minn.Stat. § 216B.47, but rather, as a methodology to calculate the enumerated four factors. The city contends that because Minn.Stat. § 216B.47 specifically includes the words "eminent domain" and the eminent-domain procedures set forth in chapter 117 apply to eminent-domain proceedings conducted pursuant to Minn.Stat. § 216B.47, the fair-market-value standard should also be applied to calculate damages under Minn. Stat. § 216B.47. But in our view, fair market value—whether characterized as a separate factor or a "methodology"—is not compatible with the four enumerated factors. As Red River correctly notes, eminent-domain proceedings involving electric utilities are unique because there is not a market of willing buyers and sellers. This is not a conventional taking of land by the state or a city to build or widen a road. What is being acquired here is part of an electric-utilities service area, and the damages provided by section 216B.47 are specific and unique to this kind of acquisition. The uniqueness of this service area is best evidenced by the fact that Red River and the city both had infrastructure in place to provide electric utilities to the customers in the area at issue, and it is not likely that any third parties could provide electric utility service to the customers. The fact that the plain language of the statute does not require that fair market value be used to calculate damages in the electric-utilities context strongly suggests that the legislature recognized the unique situation of eminent-domain proceedings involving electric utilities. In sum, the city's suggestion that "just compensation" can *only* mean "fair market value" is contradicted by the plain language in Minn.Stat. § 216B.47, which specifically provides an alternative method to determine just compensation in the unique electric-utilities context.

The city further argues that the fourth factor set forth in Minn.Stat. § 216B.47, "other appropriate factors," is broad enough to encompass fair market value. In contrast, Red River argues that fair market value should not be considered under "other appropriate factors" because it would function as a limitation on the other factors when the fourth factor was, in fact, intended to expand the damages calculation. For two reasons, we agree that fair market value should not be imported into the fourth statutory factor. First, as noted above, the unique nature of utility-service-area condemnations renders ascertaining a "fair market value" problematic. Second, the plain language of Minn.Stat. § 216B.47 provides that damages "must include" three specified factors, "and other appropriate factors." This language indicates that the legislature intended to include any information that would be rele-

vant to the damages calculation from the seller's perspective. If fair market value was considered as an "other appropriate factor[ ]," it would limit the seller's damages under the three other factors, rather than expanding them.[1]

The city argues that if fair market value is excluded when calculating damages under Minn.Stat. § 216B.47, then damages will be inherently higher. Not surprisingly, the city disfavors higher damage awards, but we note that the city stops short of arguing that Minn.Stat. § 216B.47 is unconstitutional. Red River contends that, because eminent-domain proceedings pursuant to Minn.Stat. § 216B.47 are not traditional eminent-domain proceedings, damages are unique and appropriately higher than damages calculated under a fair-market-value analysis. Again, we agree with Red River. We acknowledge that fair market value is the typical method to calculate just compensation in eminent-domain proceedings, but the legislature can require a different method to calculate damages that results in higher-than-market-value damages in certain circumstances. As the district court noted, Minnesota law provides for specific methods of determining damages in eminent-domain proceedings in certain circumstances. *See e.g.,* Minn.Stat. §§ 117.186 (stating requirements for compensation for loss of going concern); .187 (stating minimum-compensation requirement if owner must relocate). The legislature has also chosen to provide for a method of calculating damages that is more accurate than fair market value in the unique situation of calculating just compensation in the electric-utilities context pursuant to Minn.Stat. § 216B.47.

Finally, Red River notes that, because identical factors appear in both Minn.Stat. § 216B.47 and Minn.Stat. § 216B.44, the words must have the same meaning in both statutes. Red River argues that it would create an absurd result if this court allowed fair-market-value evidence to be considered under Minn.Stat. § 216B.47, when it has not been considered in cases under Minn.Stat. § 216B.44, which have been affirmed by this court. The city argues that this court is not bound by the MPUC's interpretation of the factors in Minn.Stat. § 216B.44. The district court found that, while it is not bound by the MPUC's interpretation of the factors in Minn.Stat. § 216B.44, the MPUC's interpretation of the factors is persuasive.

Because the MPUC's application of the four factors supports our conclusion that the plain language of Minn.Stat. § 216B.47 precludes consideration of fair market value, we need not address whether the district court is bound by the MPUC's interpretation of the four factors in Minn.Stat. § 216B.44. Accordingly, we conclude that the district court did not err when it found that the plain language of Minn.Stat. § 216B.47 precludes consideration of fair market value. For the reasons articulated above, we also conclude that the district court did not err when it concluded that fair market value is not the correct legal standard to calculate loss-of-revenue damages, nor did it abuse its discretion by excluding fair-market-value evidence at the trial and in the jury instructions.

**II**

 The city next argues that the district court abused its discretion when it excluded the city's revised expert report regarding facility-replacement costs. This

---

1. We also note that the city stipulated at trial that the damages for "other appropriate factors" were $0. Thus, its argument here on appeal that this factor could include fair-market-value damages is inconsistent with its stipulation at trial.

court reviews evidentiary rulings with deference. "Entitlement to a new trial on the grounds of improper evidentiary rulings rests upon the complaining party's ability to demonstrate prejudicial error." *Kroning*, 567 N.W.2d at 46 (quotation omitted). It is within the district court's discretion to exclude expert testimony. *Gross v. Victoria Station Farms, Inc.*, 578 N.W.2d 757, 760–61 (Minn.1998).

■■■ The city argues that the jury was not permitted to hear testimony about a significant amount of money that the city anticipated spending in the ten year loss-of-revenue period to replace facilities. The city maintains that it had a duty to supplement its expert reports, and it made its best effort to provide that information in a timely fashion. It asserts that the costs were identified in a report dated July 20, 2010, which it did not receive until August 2010. The revised report was provided to Red River on September 8, 2010. The city further argues that the district court's decision to exclude the evidence was a severe sanction, and the evidence could reasonably have changed the result of the trial. In response, Red River contends that the city's claimed damages were speculative and that the report was submitted well outside of the discovery deadlines.

The district court excluded the revised expert report because the trial had been rescheduled twice in order to accommodate counsel for the city, the revised report was submitted 33 days before trial, and Red River would have been severely prejudiced if the report were admitted. The third amended scheduling order set the deadline for exchange of expert reports as December 22, 2009, and the fourth amended scheduling order did not change that deadline. The revised report was submitted on September 8, 2010, which was well outside of the discovery deadline. While the city argues that it had a duty to supplement its expert reports, it is not clear that the additional information could not have been obtained closer to the discovery deadline. And the district court correctly found that Red River would have been severely prejudiced if the report were admitted because it would have needed to conduct additional discovery related to the new information. In addition, the district court properly noted that continuing the trial again would have "prolonged already protracted litigation (the case having been filed in 2006)." The district court also noted that the city had the opportunity to present evidence regarding the estimated cost of improvements and maintenance. On this record, we conclude that the district court did not abuse its discretion when it excluded the untimely evidence submitted by the city.

### III

■■■ Finally, the city argues that the jury's special verdict was not supported by the evidence. Specifically, the city argues that the verdict for the "loss-of-revenue" factor was contrary to the evidence regarding purchased-power, operation, and maintenance expenses. This court reviews a jury's special-verdict decision with deference and will set it aside "only if it is perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable persons." *Anda*, 789 N.W.2d at 888 (quotation omitted).

Here, the jury returned a verdict for the "loss-of-revenue" factor in the amount of $339,865, which was the exact amount advocated by Red River's expert. The jury heard testimony from two different experts, who presented different opinions about the amount of damages. The fact that the jury returned a verdict for the exact amount of damages that Red River's

expert calculated indicates that they concluded that Red River's expert's opinion regarding the calculation of damages was more persuasive. We conclude that the jury's verdict was not contrary to the evidence.

## DECISION

Fair market value is not the proper measure of damages under Minn.Stat. § 216B.47, and the district court did not err when it excluded fair-market-value evidence from the jury trial and limited the calculation of damages to the factors specifically enumerated in Minn.Stat. § 216B.47. Additionally, the district court did not abuse its discretion when it excluded the city's untimely expert report, and the jury's special verdict was not contrary to the evidence.

**Affirmed.**